UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

MARILYN MITCHELL,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )          No.:  3:14-CV-360-TAV-HBG
                                     )
TENNESSEE VALLEY AUTHORITY,          )
                                     )
            Defendant.               )

**MEMORANDUM OPINION**

This action is before the Court on TVA's Motion for Summary Judgment on All

Phase II Issues as to the Tract Involved in this Case – Roane County Tax Parcel No. 026E

G 013.00 Located at 813 Clifty Street, Harriman, Tennessee [Doc. 7].  Plaintiff has not

filed a response to the motion, and the time for responding has expired.  E.D. Tenn. L.R.

7.1, 7.2.  After careful consideration of the record and relevant law, and for the reasons

explained herein, the Court will grant the motion for summary judgment and dismiss this

case.

**I.      Background**

This case was severed from the TVA Ash Spill Litigation, Case Number 3:09-CV-

54-TAV-HBG [Doc. 1].   In that action, TVA moved for summary judgment on no-

causation grounds with respect to numerous tracts in the TVA Ash Spill Litigation, but

TVA did not provide tract-by-tract factual analysis for all of the involved tracts.  Viewing

the collective evidence of record in the light most favorable to plaintiffs, the Court denied

TVA's motion as to "pure property damage, trespass, and nuisance" as to all tracts. *In re TVA Ash Spill Litigation* (*2011 Ash Spill Litigation*), 805 F. Supp. 2d 468, 495 (E.D. Tenn. 2011). TVA now moves the Court for summary judgment as to the specific tract of real property involved in this case.

Plaintiff Marilyn Mitchell's claims are based upon her ownership of a tract of property at 813 Clifty Street in Harriman, Roane County, Tennessee (the "subject tract") [Case No. 3:09-CV-54-TAV-HBG Doc. ("*Auchard* Doc.") 437 PageID 7716]. Plaintiff purchased the subject tract in 2007 for $110,000 [Doc. 7-1 p. 4–5]. As indicated by Google Maps,[1] the subject tract is on a Harriman city street on the south side of Harriman. The tract is about 2.1 miles northwest of the ash spill site, about 0.2 mile from the Emory River at its closest point, and about 0.4 mile north of Harriman High School [Doc. 5 ¶¶ 3–4].

Plaintiff claims that the ash from the spill "physically invaded and contaminated" her property [*Auchard* Doc. 437 PageID 7732]. And she alleges the ash "invaded and contaminated a large swath of the land and river nearby" her property [*Id.* at 7731]. Plaintiff seeks compensatory damages for the diminution in market value of her property and for the loss and use and enjoyment of her property [*Id.* at 7741].

---

[1] The Court may take judicial notice of Google Maps to determine distances and locations. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177 n.3 (7th Cir. 2013); *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013); *Eden Isle Marina, Inc. v United States*, 113 Fed. Cl. 372, 471 n.138 (2013).

2

In her February 2011 deposition, plaintiff testified that her subjective feelings had caused her to make changes in her actual and potential uses of the subject tract and the nearby river:

> Q. And one of the claims that you are bringing in your lawsuit is loss of use and enjoyment of your property?
>
> A. Yes.
>
> Q. And describe how the ash spill has affected the use and enjoyment of your property.
>
> A. I'm indoors more. When I notice a lot of black soot that I -- in that -- in the driveway, I hurry -- like the mowing done -- sometimes I like to do the mowing because I can use the exercise. When the ash spill happened, my son tries to be the big guy, the big strong guy. And after initially looking at the spill and everything, he even went into a depression. He could not believe what -- you know, the ash spill.
>
> Other things that we are not able to do in the house is we can't use the tap water. I wouldn't even give the tap water to my dogs. I have before, or someone else has gave my dogs water from the tap, and you would not believe how sick even the dogs get. They start vomiting. They cannot take all the chlorine right now that's in the water.
>
> I think I mentioned before in some of your questions the dogs and I were able -- and my grandson, we were able to go to the creek and play in the water. And we cannot do that any longer in the nearby waters near my property.
>
> And when the ash spill happened, there was a lot of trucks blocking us in, blocking traffic. The railroad; the trains were backing up the traffic. Initially, there was a lot of soot particles in the air from the trucks that was flying on our vehicles. We would even drive a few blocks into town to get groceries or anything, and we had to pass all those trucks and the train.
>
> Q. Okay.

3

A. And I think I have mentioned that we have less time outdoors on the property. We have learned to stay indoors a lot when we are home. We drive out of the area for -- to get to other water places to play in with the dogs and that.

Q. Okay.

A. So we buy lots of water, lots of air filters. We travel a lot to get to water. And I think -- I try to close this out. Also, I think in the last -- in the last month, TVA has announced that we are going to have to pay further for this incident. They are going to increase our utilities, increase the payment.

[Doc. 7-1 p. 8–10].

Regarding her loss of use and enjoyment of Watts Bar Reservoir, plaintiff's primary claim is that she no longer allows her dogs to play in or near the water:

Q. Okay. Are you bringing any claims in your lawsuit for loss of use and enjoyment of Watts Bar Reservoir?

A. I walk that area with my dogs. I believe the river also runs right here on this map on your Exhibit 4. If you went through these houses, the river is there and my dogs would swim that area. Since this ash spill, I will not let my dogs in that water, and it's that loss of enjoyment, yeah. Me and the dogs played in the water, and now we have to drive up to other places for the dogs to be able to swim in the water.

A. And they used to be able to before the spill. It's hard for -- the boxers love water, and it's hard to keep them out of the water.

Q. Okay. And I think you said since the ash spill you now have to drive them somewhere else to get in the water?

A. Yes.

Q. Okay. Where do you take them?

A. There is a creek called Flat Rock several miles -- we will drive several miles for them to be able to be in the water. We will drive

4

into Knoxville from Harriman into Sequoyah Hills. There is a park there and river there, and --

Q. Okay.

A. -- I let them spend a few hours there. They are big dogs. They need exercise and the water is a way to exercise them.

Q. Is there any other way that you are claiming loss of use and enjoyment of Watts Bar Reservoir besides not letting your dogs get in the water and having to take them further to walk?

A. You know, I'm not thinking at this time. At this time, no, that I can think of.

[*Id.* at 6–8].

Regarding fly ash particles that plaintiff contends entered her property through the air, through her drinking water, and from trucks and trains involved in TVA's spill response and recovery activities, plaintiff testified as follows:

Q. Okay. Another claim you are bringing in your lawsuit is a claim for trespass I think you said earlier?

A. Correct.

Q. Okay. And so how do you believe that ash has gotten onto your property?

A. Well, even in 2010, there is particles. There is -- some type black particles substance in my driveway where it has to be washed out much -- and so since the ash spill, I feel like -- since the invasion that it was just an invasion overall.

Q. Okay. And so part of your claim for trespass is that you believe ash particles have gotten to your property through the air?

A. Oh, yeah.

5

Q. Okay. Is there any other way that you believe ash particles have gotten onto your property?

A. I use more filters. There is a lot more dirt in general around the property. And I'm suspicious of the water and all the chlorine in the water.

Q. Okay. And so do you believe that ash particles have gotten to your property through the drinking water possibly?

A. I repeat. I'm not real sure why there is so much chlorine in the water. I am suspicious that it's related to the ash spill.

[*Id.* at 12–13]. Plaintiff also noticed particles on her vehicles and attributed the presence of some of those particles to trucks and trains involved in recovery operations:

A. Initially, when the ash spill occurred, our vehicles had lots of particles on them. And that -- and that again, us going past the trucks and the train that was used to remove the ash.

Q. Okay. And so do you think that the particles on your vehicles might have come from the trucks and the trains?

A. Some of it, yes, but just -- if we didn't drive the pickup for several days, you could go out and it would be covered with this black particle that was also in the driveway.

[*Id.* at 14–15].

Regarding environmental testing and analysis of areas where she claimed to have observed particles, plaintiff acknowledged that none had been performed:

Q. As far as your property, who provides the water utilities to your property?

A. Oh, the water utilities, that is the City of Harriman.

Q. Okay.

A. Okay.

6

Q. And have you ever called the City of Harriman to request that your water be tested?

A. No. No.

. . .

Q. Okay. Did you ever take any photographs of any of the black particles you saw on the outside of the house and -- that would be the driveway, the porches, or the side of the house?

A. No.

Q. Did you ever collect any samples of any of the black particles you saw on the driveway, the porches, or the outside of the house?

A. No.

Q. So you didn't have any black particles tested that you saw on the driveway, the porches, or the side of the house?

A. No.

. . .

Q. Have you ever had any of those air filters tested?

A. No.

[*Id.* at 11, 16, 17]. And in her Rule 36 admissions, plaintiff stated there had been no testing, sampling, or monitoring of the air, soil, or water on her property after the ash spill [Doc. 7-2].

Regarding testing, evidence submitted by TVA indicates that at the time of the ash spill, there were sixteen PM2.5 monitors within forty miles of the spill site, including two monitors located at Harriman High School, just 0.4 mile from the subject tract, that were

7

providing data to the United States Environmental Protection Agency ("EPA") Air Quality System ("AQS"), which is a computerized system for storing air quality data obtained by Federal and State agencies and other entities to assess air quality, designate attainment/nonattainment areas, and perform modeling and other air quality management functions [*Auchard* Doc. 161-1 PageID 4962–64, 4967]. Within days after the ash spill, TVA also established air monitoring, and the air monitoring data from that network was made publically available at http://www.tva.gov/kingston/air/index.htm.[2] The EPA regularly audited TVA's air monitoring network, which included air monitoring data from the two PM2.5 air monitors at Harriman High School, and those audits were made publically available.[3] The audits found that the air monitoring network met performance standards.

Based upon the analysis of hundreds of thousands of readings from air monitors around the spill site, including those at Harriman High School in the immediate vicinity of the subject tract, the Tennessee Department of Health's September 7, 2010, Final Public Health Assessment reported that the ash spill did not "increase[] particulate matter . . . in ambient air around the site" [*Auchard* Doc. 161-2 PageID 5000], and "air data

---

[2] The Court may take judicial notice of "public records and government documents available from reliable sources on the Internet." *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003). *See also Paralyzed Veterans of Am. v. McPherson*, No. C 06-4670 SBA, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 9, 2008).

[3] U.S. EPA, *Annual Performance Audits, Network Review, and Data Review of the Ambient Air Monitoring Network at the Kingston, Tennessee Fossil Plant Fly Ash Removal Project*, at 7 (Dec. 12, 2012), *available at* http://www.epakingstontva.com/EPA%20Air%20Aud its%20and%20Reviews/Air%20Audit%20Reports/2012%20Air%20Audits/EPA%20Air%20Audit _December%202012.pdf ("TVA continues to operate an excellent air monitoring network at the Kingston Fossil Plant.").

8

from all the agencies indicated that particulate matter was not elevated in the ambient air surrounding the ash spill" [*Id.* at 5257]. And regarding the five days between the spill and the beginning of air monitoring, the Public Health Assessment concluded: "The coal ash was wet when it spilled. Wet weather for three days after the spill, combined with low temperatures and slow wind speeds, would have kept the coal ash from drying out and getting in to the air" [*Id.* at 5012].

## II.  Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002). Yet, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of

9

fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.    Analysis

After conducting a Phase I trial in the TVA Ash Spill Litigation, the Court held that nondiscretionary tortious conduct by TVA was a proximate cause of the ash spill, and that, as a result, TVA potentially is subject to liability in tort under theories of private nuisance, trespass, and negligence causing pure property damage. *2012 TVA Ash Spill Litigation*, 2012 WL 3647704, at *62. The Court summarized plaintiff's burden going forward as follows:

> [E]ach plaintiff in the TVA Ash Spill Litigation now faces an individualized burden in the Phase II proceedings. In Phase II, each

10

> plaintiff must prove the elements of his or her respective negligence, trespass, and/or private nuisance claims by a preponderance of the evidence. . . . [Those] individualized issues includ[e]: whether coal ash is or was present on each plaintiff's specific property; whether the presence of the coal ash on the specific property can be traced to TVA's nondiscretionary conduct; whether the coal ash has damaged each specific property; whether and how the coal ash affects each plaintiff's use and enjoyment of said property; and the amount of damage, if any, to each property and to each plaintiff.

*Id.* at *5. TVA now asserts that plaintiff cannot establish the elements necessary to recover under any of the three tort theories remaining in this case. *2011 TVA Ash Spill Litigation*, 805 F. Supp. at 468. *See also In re TVA Ash Spill Litigation* (*2012 TVA Ash Spill Litigation*), 2012 WL 3647704, at *62 (E.D. Tenn. Aug. 23, 2012) (dismissing plaintiff's claims of "negligence per se, recklessness, strict liability, and public nuisance").

### A.  Private Nuisance

To establish private nuisance, plaintiff must demonstrate that fly ash from the ash spill, on or near the subject tract, "constitutes an invasion of legally protectable *property interests* that rises to the level of what a reasonable person with ordinary sensibilities would consider an unreasonable interference with the use and enjoyment of property." *2011 Ash Spill Litigation*, 805 F. Supp. 2d at 488. To determine whether "a particular use of property is a nuisance, the Court must look to "its effect upon persons of ordinary health and sensibilities, and ordinary modes of living, and not upon those who, on the one hand, are morbid or fastidious or peculiarly susceptible to the thing complained of, or, on the other hand, are unusually insensible thereto." *Jenkins v. CSX Transp., Inc.*, 906

11

S.W.2d 460, 462 (Tenn. Ct. App. 1995) (citation omitted). In other words, "'[t]here is liability for a nuisance only to those to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in the normal condition and used for a normal purpose.'" *Id.* (alteration in original and citation omitted).

TVA argues that the uses and potential uses of the subject tract did not change in any significant, material, or substantial manner as a result of the spill. Upon review of the record, the Court agrees. Plaintiff's subjective concerns about the property do not provide a basis for a private nuisance claim, as "the fears of mankind will not alone create a nuisance." *Cheatham v. Shearon*, 31 Tenn. 213, 216 (1951). *See also Freeman v. Blue Ridge Paper Prods.*, 529 F. App'x 719, 727 (6th Cir. 2013) (stating that "to allow for recovery of fear-based claims that are ungrounded in scientifically verified evidence is a sweeping declaration in support of which Plaintiffs have offered no North Carolina authority"); *Reid v. Memphis Mem'l Park*, 5 Tenn. App. 105 (1927) (finding that the law does not protect against devaluation injury resulting from "'merely fanciful'" disquietude (citation omitted)). Moreover, plaintiff's decision to not allow her pets swim in the water due to any unsightliness of the Emory River or Watts Bar Reservoir does not give rise to a private nuisance claim. *Reid*, 5 Tenn. App. at 117, 121 (finding that a cemetery is not a nuisance merely because it is offensive to the "aesthetic sense" or "aesthetic tastes" of adjoining owners). And because plaintiff is not a riparian owner, she has no property interest in the Emory River or Watts Bar Reservoir upon which to base a claim. Indeed,

12

even if she were a riparian owner, her rights would not support a finding of private nuisance based upon any claim of diminished recreational opportunities. *Mildenberger v. United States*, 643 F.3d 938, 948 (Fed. Cir. 2011) ("The right [of a riparian owner] to have access to the water refers to physical access to the edge of the water, not access to its full potential, including swimming and viewing wildlife."). Finally, plaintiff has no legally protectable private property right or interest to navigate the Emory River or Watts Bar Reservoir free of obstructions; to the extent TVA's actionable conduct caused any obstructions to navigation, any claim based thereon would be for public nuisance, not private nuisance. *See Felton v. Ackerman*, 61 F. 225, 227 (6th Cir. 1894) ("[T]he authorities are quite clear to the point that such a damage [obstruction of a public way] is not one which can be remedied by private action. It is a damage which the public share with the particular complainant."); *Lowery v. Petree*, 76 Tenn. 674, 678 (1881) ("No person can maintain an action for damages for a common nuisance [obstruction of a public way], where the injury and damage are common to all."); *see also Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 259 (9th Cir. 1973) ("There is no right under California law to recover for damage [caused by pollution] to the navigational rights [in Santa Barbara Channel] enjoyed by these plaintiffs. . . . [P]laintiffs' claim is not for 'loss of use' of their boats; the boats themselves were perfectly usable. Rather, the claim is for loss of 'navigation rights' in the Santa Barbara Channel. Thus their claim is, under California law, a claim for damages arising out of a public nuisance.").

13

Accordingly, for these reasons, and pursuant to Rule 56(e)(3),[4] the Court will dismiss plaintiff's private nuisance claim.

## B. Private Trespass and Negligence

To recover under a private trespass or negligence theory, plaintiff must show that "particles from the ash spill, either tangible or intangible, entered plaintiff['s] propert[y] and would not have done so 'but for' actionable conduct by TVA." *2011 TVA Ash Spill Litigation*, 805 F. Supp. 2d at 484. *See also 2012 TVA Ash Spill Litigation*, 2012 WL 3647704, at *62 (noting that it is a "threshold requirement that each plaintiff show that tangible or intangible particles from the coal ash spill actually entered their respective properties"). TVA asserts plaintiff cannot meet this specific causation requirement, and the Court agrees.

TVA submits that the expert reports plaintiff furnished to TVA do not provide a basis for concluding that any ash particles in fact entered the subject tract and would not have done so "but for" TVA's actionable conduct. Moreover, TVA has submitted evidence that, based on the analysis of hundreds of thousands of readings from air monitors around the spill site, the Tennessee Department of Health's September 7, 2010, Final Public Health Assessment reported that the ash spill did not "increase[] particulate matter . . . in ambient air around the site" and "air data from all the agencies indicated that particulate matter was not elevated in the ambient air surrounding the ash spill"

---

[4] Rule 56(e)(3) provides: "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it[.]"

[*Auchard* Doc. 161-2 PageID 5000, 5257].  And with respect to the five days between the spill and the beginning of air monitoring, the Public Health Assessment concluded: "The coal ash was wet when it spilled.  Wet weather for three days after the spill, combined with low temperatures and slow wind speeds, would have kept the coal ash from drying out and getting into the air" [*Id.* at 5012].[5]

Accordingly, for this reason, and pursuant to Rule 56(e)(3), the Court will dismiss plaintiff's private trespass and negligence claims.

## IV.    Conclusion

For the reasons stated herein, the Court will **GRANT** TVA's motion for summary judgment [Doc. 7] and **DISMISS** this case.  The Clerk of Court will be **DIRECTED** to **CLOSE** this case.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

---

[5] Assuming plaintiff could demonstrate some ash particles had entered the subject tract, the Court finds nothing in the record that indicates she would be able to demonstrate any such particles resulted from actionable conduct of TVA.  This is, at least in part, because TVA submits fly ash particles have been present in the general area for many decades due to the operation of the Kingston Fossil Plant and other coal-fired industrial plants.

15